UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NORMAN JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 14-cv-10117 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| THE ESTATE OF SALEH OBAISI and | ) | |
| WEXFORD HELATH SOURCES, INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Norman Johnson, a prisoner at Stateville Correctional Center, brings this civil rights lawsuit, 42 U.S.C. § 1983, alleging a violation of his Eighth Amendment rights.[1] Defendants are Wexford Health Sources, Inc., a private corporation that provides medical services at Stateville, and Wexford doctor Saleh Obaisi, who was Stateville's medical director.[2] The Defendants filed a motion for summary judgment on December 28, 2018. R. 140.[3] For the reasons explained below, the Defendants' motion is granted in part and denied in part.

**I. Background**

This case arises out of the treatment of two medical conditions suffered by Norman Johnson: a varicocele on his left testicle and a lipoma on his head. R. 151,

---

[1]This Court has subject matter jurisdiction over the case under 28 U.S.C. § 1331.
[2]As a formal matter, the named defendant is actually the Estate of Saleh Obaisi. After Obaisi's death, the Court granted Johnson's motion to substitute the Estate of Saleh Obaisi in lieu of Obaisi himself. R. 136.
[3]Citations to the record are noted as "R." followed by the docket number.

Pl.'s Resp. Br. at 6.[4] For clarity's sake, this Opinion will address each medical condition separately, though the relevant events overlap chronologically. The facts narrated here are undisputed unless otherwise noted. At the summary judgment stage, the Court views the evidence in the light most favorable to Johnson, the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### A. Varicocele

In early August 2013, Johnson filled out a request asking the prison's medical staff to treat a lump on his left testicle. R. 72, Third Am. Compl., Exh. 1 at 3. On January 23, 2014, Johnson complained specifically to Dr. Obaisi about the lump. R. 142, DSOF ¶ 37; DSOF, Exh. B, Obaisi Dep. Tr. at 116:6-17.[5] Dr. Obaisi prescribed 100mg of Minocycline (an antibiotic) twice a day for three weeks, and planned for a follow-up visit in four weeks. Obaisi Dep. Tr. at 119:10-14. Around four weeks later, on February 27, Dr. Obaisi saw Johnson again, DSOF ¶ 38, but the parties dispute whether Johnson complained of left-testicle pain at this visit. Obaisi testified that Johnson made no complaint of testicle or scrotal pain. Obaisi Dep. Tr. at 120:12-18.

---

[4]The Defendants asked to strike the factual citations in Johnson's response brief because the brief cited directly to the discovery record rather than the Local Rule 56.1 Statements. It is true that the better practice would be to cite the 56.1 Statements (and the best practice would be to parallel cite). But the rule does not explicitly require it, nor does this Court's Standing Order on Summary Judgment motions, so the request is denied.

[5]Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for the Defendants' Statement of Facts [R. 142], "PSOF" for Johnson's Statement of Facts [R. 151-2], "Pl.'s Resp. DSOF" for Johnson's response to the Defendants' Statement of Facts [R. 151-2], and "Defs.' Resp. PSOF" for the Defendants' response to Johnson's Statement of Additional Facts [R. 158]. Johnson has also filed supporting exhibits to his response brief, which will be identified as "Pl.'s Supp. Exh." [R. 151-1].

According to Johnson, though, "[e]very time [he] talk[s] to [Obaisi] [he] tell[s] him everything that's going on with [him], he [Obaisi] just don't write it down." DSOF, Exh. A, Johnson Dep. Tr. at 86:20-24. Johnson also wrote, on an August 2014 grievance form, that he was given Cephalexin 500mg on February 25, 2014 for his testicle pain and that he was still in pain. Third Am. Compl., Exh. 1 at 7.

In late March 2014, Dr. Obaisi saw Johnson again. This time, it is undisputed that Johnson complained of discomfort and testicular pain. DSOF ¶ 39; Obaisi Dep. Tr. at 135:6-13. Obaisi diagnosed Johnson with chronic epididymitis,[6] changed the antibiotic to Levaquin, and added Prednisone to make the Levaquin more potent. DSOF ¶ 39; Obaisi Dep. Tr. at 135:22-24. In his deposition, Obaisi confirmed that he elevated Johnson's treatment to a more intense prescription regimen based on Johnson's continued complaints. Obaisi Dep. Tr. at 136:3-7. In early April 2014, Obaisi ordered a urinalysis for Johnson to rule out a urinary tract infection as the source of the testicular pain; the urinalysis result was within normal range. DSOF ¶ 40; Obaisi Dep. Tr. at 136:8-19. A repeat urinalysis and a syphilis test performed in May 2014 were both negative. DSOF ¶ 41; Obaisi Dep. Tr. at 137:1-16.

On May 4, 2014, Johnson filed another grievance, complaining again about a painful lump on his left testicle that had not been alleviated by his prescription, and about not receiving a biopsy for that lump, as promised by Dr. Obaisi. Third Am.

---

[6]Dr. David A. Guthman, one of the Defendants' expert witnesses, testified that "epididymitis is an inflammation of the epididymis which is a gland on the back of the testicle. It's usually inflammatory. It can often also be infectious, more often viral than bacterial. It's typically treated with elevation, antibiotics, and anti-inflammatories." DSOF, Exh. I, Guthman Dep. Tr. at 33:5-10.

Compl., Exh. 1 at 6. Although it is unclear from the record what response Johnson received after he filed his grievance, it appears that he appealed it. In January 2015, the Administrative Review Board responded to the May 2014 grievance and denied Johnson's request on the merits, finding that the issue was appropriately addressed by the prison and adding that "the ordering of tests must be done by attending physician." Third Am. Compl., Exh. 5. In the meantime, Johnson filed another grievance, this time on August 7, 2014, reporting pain and a growing "cyst" on his left testicle, as well as difficulty urinating. Third Am. Compl., Exh. 1 at 7.

Five days later, on August 12, Johnson again complained to Dr. Obaisi of continuing pain in his left testicle. DSOF ¶ 42; Obaisi Dep. Tr. at 137:17-23. Obaisi assessed chronic pain in Johnson's left testicle and requested approval for an ultrasound. Obaisi Dep. Tr. at 138:6-7, 16-21. The ultrasound was completed in early September 2014, and it showed a small left varicocele. *Id.* at 139:7-140:8. Obaisi did not examine Johnson again for more than a month, on October 29, when Johnson again reported pain in his left testicle. *Id.* at 140:17-23. Noting the results of the ultrasound, Obaisi diagnosed Johnson with a varicocele and put in a prescription order for a scrotal support device. *Id.* at 141:13-142:2. Johnson stated in his affidavit that he did not receive the scrotal support until December 23, nearly two months after it was prescribed. R. 151-1, Pl.'s Supp. Exh. G, Johnson's Affidavit at ¶ 29. Neither party has offered any evidence to explain the delay.

Fast forwarding to 2015, on September 23 of that year, Johnson again complained to Dr. Obaisi of left testicle pain. DSOF ¶ 46; Obaisi Dep. Tr. at 143:2-18.

Obaisi requested a physician collegial review to discuss a potential urology consultation for Johnson's varicocele and for his complaints of testicular pain.[7] DSOF ¶ 46; Obaisi Dep. Tr. at 144:8-23. The collegial-review discussion took place 12 days later, on October 5. R. 151-2, Pl.'s Resp. DSOF ¶ 45; Obaisi Dep. Tr. at 144:8-19. The urology consultation was not approved; instead, the physicians agreed on an alternative treatment plan, that is, to continue with the scrotal support device. Obaisi Dep. Tr. at 145:10-15. Dr. Obaisi agreed to re-consult the physician collegial review upon completion of the alternative plan, if indicated. *Id.* at 145:19-146:6.

Around three months later, on January 25, 2016, Johnson had an appointment with Physician Assistant LaTanya Williams; he complained to her that his testicle pain was the same. DSOF, Exh. D, Williams Dep. Tr. at 62:6-12. Williams assessed Johnson as having chronic testicular pain and noted that she would refer Johnson to the medical director for "[c]hronic headaches/hydrocele/testicular pain chronic." *Id.* at 62:22-63:15. She prescribed pain medication: Atenolol 100mg daily and Naproxen 500mg as needed or twice a day (although it is unclear whether this was meant to alleviate Johnson's testicular pain or headaches or both). *Id.* at 63:1-15. In early February 2016, Johnson saw Dr. Obaisi. DSOF ¶ 49; Obaisi Dep. Tr. at 147:7-15. During this visit, Johnson reported that his left testicle pain had worsened during the last few days. *Id.* Obaisi's assessment was tenderness epididymis with slight

---

[7] If the Stateville Medical Director agrees that a patient may need off-site medical services, the Director may place a referral to Wexford's Utilization Management team for a collegial-review discussion to evaluate the request. DSOF ¶ 23. Collegial review discussions occur weekly, and participants include Wexford's Corporate Director for Utilization Management and the Medical Director. DSOF ¶ 24.

swelling. Obaisi Dep. Tr. at 147:16-18. Obaisi prescribed an injectable antibiotic for five days, in addition to scrotal support and follow-up in four weeks. *Id.* at 147:19-22. But Johnson asserts in his affidavit that he did not see Obaisi again until May 3, 2016, around three months later. Johnson's Affidavit at ¶ 38. According to Johnson, Obaisi stated that the varicocele had progressed to a moderate size and prescribed Johnson 200mg of Tegretol twice daily, in addition to the scrotal support. *Id.* In June 2016, another collegial-review discussion was held, and Wexford approved Johnson for a urology evaluation at the University of Illinois-Chicago (which is commonly referred to as UIC). DSOF ¶ 50; Obaisi Dep. Tr. at 148:7-20.

At the end of November 2016, Johnson went to UIC and saw Dr. Simone Crivellaro, a urologist. DSOF, Exh. G, Crivellaro Dep. Tr. at 21:5-7. Neither party has explained why it took nearly six months to schedule Johnson for this consultation. In any event, during the appointment, Johnson described his pain as "sharp" and "intermittent," localized to the area of the testicle, and at a pain level of 6 out of 10. *Id.* at 23:2-6, 38:5-24; *see also* Pl.'s Supp. Exh. F at 32-33. The clinic note described a nontender and enlarged left testicle, normal epididymitis (meaning no inflammation), and a Grade Two spermatic cord left varicocele. Crivellaro Dep. Tr. at 22:10-24:18; *see also* Pl.'s Supp. Exh. F at 32-33. Dr. Crivellaro prescribed Johnson with Ibuprofen for pain management. Crivellaro Dep. Tr. at 27:17-28:5.

In early August 2017, Johnson had a follow-up appointment with Dr. Crivellaro. DSOF ¶ 52; Crivellaro Dep. Tr. at 29:5-7. Johnson complained that the swelling had worsened, and the physician noted that the "pain is sharp in nature,

localized, and does not radiate." Pl.'s Resp. DSOF ¶ 51; Crivellaro Dep. Tr. at 29:17-23.[8] The varicocele was classified as a clinically nonsignificant Grade One, which Dr. Crivellaro testified means that surgical treatment is not indicated. DSOF ¶ 52; Crivellaro Dep. Tr. at 31:11-18, 32:6-19, 32:20-33:2. Crivellaro's treatment plan consisted of pain control with Tramadol based on Johnson's complaints of worsening pain, as well as scrotal support. Pl.'s Resp. DSOF ¶ 51; Crivellaro Dep. Tr. at 32:20-33:2, 46:20-47:2.

A few months later, in mid-November 2017, Johnson asserts in his affidavit that Dr. Obaisi referred him for a scrotal sonogram. Johnson's Affidavit at ¶ 45. Johnson also says that he was again prescribed a scrotal support a few days later by another doctor. *Id.* Johnson continues to experience testicular pain to this day. R. 151-2, PSOF ¶ 113; Johnson's Affidavit at ¶ 60.

## B. Lipoma

In mid-June 2011, Johnson filed his first grievance relating to a large lump on his head, as well as a headache. PSOF ¶ 89; Pl.'s Supp. Exh. B. In February 2012, Johnson complained to Physician Assistant Williams that he has had a lump on his head for the past 12 months and that he experienced pain when combing his hair. DSOF ¶ 53; Johnson Dep. Tr. at 79:11-19. Williams assessed Johnson with a mass on the forehead and planned to refer Johnson to urgent care for possible aspiration. Johnson Dep. Tr. at 79:11-19; Williams Dep. Tr. at 50:6-24. A few weeks later, on

---

[8]This was written in the "history of present illness" section. Dr. Crivellaro testified that the "history of present illness" section of the clinic note is based solely on information collected from the patient, as opposed to a physical examination. Crivellaro Dep. Tr. at 30:8-18.

February 23, Williams re-evaluated Johnson and found him to be "within normal limits." DSOF ¶ 54; Williams Dep. Tr. at 37:7-10. She noted that the bump on his head was small (1.5cm x 1.5cm), mobile, nontender to touch, well circumscribed, and solid. DSOF ¶ 54; Williams Dep. Tr. at 36:15-37:1. Williams diagnosed a "cyst forehead/hairline" and set a treatment plan for observation and follow-up in six months. Williams Dep. Tr. at 37:7-15. She also testified that she educated Johnson on things to look out for with respect to the mass. *Id.* at 37:16-19. In early April 2012, Williams learned that Johnson had filed a grievance, and she added a progress note—without seeing Johnson—assessing a lesion on the forehead and a plan to refer to "M.D. urgent care for second opinion." *Id.* at 42:4-13.

On May 1, 2012, Johnson filed another grievance, this time stating: "I was informed by Dr. Dubrick that I would need surgery to have it removed but also that I would inconvenience him to do so. He then stated that if Dr. Williams wanted to do it, she could. At that point he asked Dr. Williams if she would because he won't do it and she also stated that she won't do it because Stateville will not pay for it. This is the second time she has told me this—the tumor has become very painful … ." Pl.'s Supp. Exh. C; *see also* PSOF ¶ 90.

Physician Assistant Williams saw Johnson again on September 30, 2013, and wrote in the progress note that the lump on Johnson's forehead had not changed in size, and that it was palpable, soft, mobile, nontender, and well circumscribed. Williams Dep. Tr. at 56:15-57:5. She assessed a lipoma and ordered a follow-up at the clinic in six months for reevaluation. *Id.* at 57:7-13. One week later, Johnson filed

another grievance about the lump on his head. Third Am. Compl., Exh. 1 at 4. He filed another one on November 5, asserting, "I've been having really bad headaches (lately). Sometimes it hurts so bad, I'm unable to sleep. I've also been having blurred vision in my left eye. I talk to 'Physician Assistant Williams' and was told that I have a 'Tumor' in my head, but Statesville wouldn't pay for the surgery. I'm am [sic] asking to see an 'outside specialist' because my life may be in danger." *Id.* at 5. Under "Relief Requested," Johnson wrote: "To be seen by outside specialist to remove the 'Tumor.' Because it is getting bigger." *Id.*

Almost three months later, on February 26, 2014, a nurse recorded that the lipoma now measured 3.5cm by 3cm. PSOF ¶ 95; Johnson Dep. Tr. at 85:5-22. Over five months later, in mid-August 2014, Dr. Obaisi saw Johnson, and noted Johnson's complaints of "[h]eadache episodes over left eye with a blurred vision. Pounding headache. Episode several hours every few days." Obaisi Dep. Tr. at 137:17-4. The clinic note does not show that Johnson received any medication for the symptoms on that day. *See id.* at 137:17-138:11. Another month went by, and on October 29, 2014, Johnson complained again to Obaisi that he had blurred vision and pain in his left eye since 2012, and relayed that Dr. Dunn—a prison optometrist—had recommended an MRI. *Id.* at 121:18-122:2. Obaisi referred Johnson for an ophthalmology follow-up, an MRI, and an HVF study. PSOF ¶ 97; Johnson Dep. Tr. at 96:11-15. It is not clear from the record whether the MRI was ever performed.[9]

---

[9]Johnson does testify that he "was sent to get an MRI test." Johnson Dep. Tr. at 58:4-11. However, Dr. David Mayer, Johnson's retained expert, testified that—as of the date of Mayer's deposition on May 15, 2018—an MRI had not yet been conducted on Johnson. DSOF, Exh. H, Mayer Dep. Tr. at 88:14-18. .

Around one week later, on November 4, a collegial-review discussion between Dr. Obaisi and Dr. Ritz, Wexford's Corporate Director for Utilization Management, resulted in approval of a CT scan of Johnson's head. DSOF ¶ 61; Obaisi Dep. Tr. at 122:21-123:15. After the CT scan was performed at UIC in January 2015, Johnson was diagnosed with "a well encapsulated low attenuation lipoma" measuring 1.4cm by 3.7cm by 4.4cm. PSOF ¶ 98; Johnson Dep. Tr. at 99:1-22.

Johnson saw Dr. Obaisi again in mid-March 2015, and Johnson reported eye pain, headache, and blurred vision. PSOF ¶ 99; Johnson Dep. Tr. at 101:15-102:4. Obaisi prescribed Atenolol, HCL cream, a follow-up in eight weeks, and a referral for an optometry consultation. R. 158, Defs.' Resp. PSOF at ¶ 99; Johnson Dep. Tr. at 101:20-102:4. At the end of April 2015, an optometrist saw Johnson and prescribed him with warm compresses and artificial tears for dry eyes, as well as 500mg of acetaminophen for the headaches. PSOF ¶ 100; Johnson Dep. Tr. at 102:5-17.

At this time, despite the prescribed treatment of Atenolol, HCL cream, and Tylenol, Johnson was still experiencing symptoms. PSOF ¶ 101; Johnson Dep. Tr. at 102:20-105:8. In May 2015, Johnson was approved for an ophthalmology appointment at UIC. Johnson Dep. Tr. at 105:9-18. On August 24, 2015, the UIC ophthalmologist found no ocular reason for Johnson's headaches and recommended a neurology consultation, as well as a consultation with general surgery for a possible excision of Johnson's lipoma. DSOF ¶ 64; Defs.' Resp. PSOF ¶ 101; Johnson Dep. Tr. at 102:20-105:8. The next day, Obaisi submitted the general-surgery and neurology referral requests to Wexford collegial review, which consisted of a discussion between Dr. Ritz

and Dr. Obaisi. Obaisi Dep. Tr. at 126:16-128:5. Neither request was approved. Instead, Ritz and Obaisi decided on an alternative treatment plan to re-evaluate Johnson onsite and re-present the requests as needed. *Id.* at 128:7-20, 129:13-23; *see also* Third Am. Compl., Exh. 4. Obaisi testified that he agreed with the Wexford collegial-review discussion and signed both plans to signal his approval. Obaisi Dep. Tr. at 130:9-131:9.

On September 23, 2015, Johnson had another appointment with Dr. Obaisi. DSOF ¶ 46. This time, Obaisi made a finding of "a 6-month migraine headache" and renewed Johnson's prescription for Atenolol 50mg for six months, noting that "[p]atient requested Atenolol which resolve headache." Obaisi Dep. Tr. at 143:7-22. That same day, Johnson filed a grievance complaining, in part, about the referral denials and the headaches that he was experiencing every day. Third Am. Compl., Exh. 1 at 13.

In January 2016, Johnson reported to Physician Assistant Williams that, although the headaches had lessened over the past year, they still happened every day. Williams Dep. Tr. at 62:3-11. Williams assessed Johnson with a chronic headache and referred him to the medical director for follow-up on the "chronic headaches/hydrocele/testicular pain chronic." *Id.* at 62:22-63:15. She increased the Atenolol dosage to 100mg, and prescribed Naproxen 500mg. *Id.* at 63:1-10. Williams testified that she did, in fact, refer Johnson to the medical director—that is, Dr. Obaisi—in accordance with her plan. *Id.* at 66:17-67:1.

Johnson states in his affidavit that, on March 1, 2016, he complained to a physician of continuing headaches, was diagnosed with a migraine, and was again prescribed Tylenol. Johnson's Affidavit at ¶ 37. He underwent another CT scan in October 2016, which showed normal results, but apparently another MRI was recommended for further evaluation of the migraines. *Id.* at ¶ 41; *see also* PSOF ¶ 121. The Defendants do not dispute that this MRI was never performed. Defs.' Resp. PSOF ¶ 121; *see also* DSOF, Exh. H, Mayer Dep. Tr. at 88:14-18.

## II. Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

Prison doctors violate the Eighth Amendment when they act with "deliberate indifference to [the] serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Deliberate indifference is more than mere negligence or medical malpractice. *Collignon v. Milwaukee Cty.,* 163 F.3d 982, 988 (7th Cir. 1998); *Duckworth v. Ahmad,* 532 F.3d 675, 679 (7th Cir. 2008). Physicians may be liable if they intentionally disregard a known, objectively serious medical condition that poses an excessive risk to an inmate's health. *Gonzalez v. Feinerman*, 663 F.3d 311, 313-14 (7th Cir. 2011) (*per curiam*). A jury can infer deliberate indifference on the basis of a physician's treatment decision when the decision is so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). A significant delay in medical treatment may also support an inference of deliberate indifference, especially when the result is prolonged and unnecessary pain. *See Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008).

### A. Dr. Obaisi

### 1. Varicocele

Looking at the totality of Dr. Obaisi's treatment of the varicocele, no reasonable jury could find that Obaisi was deliberately indifferent to that medical condition. The

evidence conclusively shows that Obaisi undertook serious efforts to diagnose and to treat Johnson's testicular pain.[10] For example, the record shows that Obaisi prescribed antibiotics and a scrotal support device, *see, e.g.*, Obaisi Dep. Tr. at 119:10-14, 135:22-24, 141:13-142:2, 147:19-22; ordered urinalyses, *see, e.g.*, *id.* at 136:8-19, 137:1-16; requested and provided ultrasounds, *see, e.g.*, *id.* at 138:16-21, Johnson's Affidavit at ¶ 45; and referred Johnson to a urology specialist at UIC, *see, e.g.*, Obaisi Dep. Tr. at 148:10-149:11.

Even crediting Johnson's complaints of testicular pain, Dr. Obaisi's course of treatment was not so inadequate that a reasonable jury could infer, based on the record evidence, that it amounted to deliberate indifference. Obaisi ordered urinalysis, an ultrasound, and a urology-specialist examination. *See, e.g.*, Obaisi Dep. Tr. at 136:8-19, 139:7-140:8. Obaisi explained in his deposition that, because the varicocele was small, it was not apparent on physical examination and only showed up on an ultrasound. *Id.* at 156:13-16. In the meantime, Obaisi prescribed several different medications to treat Johnson for epididymitis, a separate condition that

---

[10]Johnson argues that he started complaining about testicular pain in late 2012 but was not examined for six months. *See* Pl.'s Resp. Br. at 7. This assertion is not borne out by Johnson's record citations. First, Johnson cites to Paragraph 22 of the Third Amended Complaint. Even assuming that an unverified complaint can count at the summary judgment stage, the allegation only says that he had been *experiencing* testicular pain since 2012—not that he reported it. Third Am. Compl. ¶ 22. Next, Johnson cites to pages 81:9-24 and 82:1-10 of his deposition, but those pages do not discuss any report of testicular pain. Johnson Dep. Tr. at 81:9-24, 82:1-10. According to the record, Johnson's first complaint of testicular pain was actually in an August 4, 2013 grievance, Third Am. Compl., Exh. 1 at 3; and the first complaint of testicular pain specifically to *Dr. Obaisi* was on January 23, 2014, DSOF ¶ 37; DSOF, Exh. B at 116:6-17. And Johnson offers no evidence to suggest that Dr. Obaisi was the cause of the delay between the first complaint in August 2013 and Dr. Obaisi's examination in January 2014.

Obaisi found upon physical examination of the testicle. *See, e.g.*, *id.* at 45:17-46:13; *see also id.* at 135:6-136:7 (testifying that, after continued complaints of pain, Obaisi provided Johnson with a more intense prescription regimen of Levaquin and Prednisone to treat the chronic epididymitis).

After the ultrasound results led Obaisi to diagnose the varicocele, he promptly prescribed Johnson a scrotal support device to alleviate the pain. Obaisi Dep. Tr. at 141:13-142:2. Although Johnson complains that he did not receive the scrotal support until December 23, 2014, Johnson offers no evidence to suggest that *Obaisi* caused the delay. *Baker v. Wexford Health Sources, Inc.*, 118 F. Supp. 3d 985, 996-97 (N.D. Ill. 2015) (granting summary judgment to physicians absent any evidence that they were responsible for delays in scheduling surgery and specialist visits). A reasonable jury could just as easily infer that the delay was caused by another reason, such as a supply shortage.

Johnson also argues that he should have been sent to UIC for a urology consultation sooner. *See* Pl.'s Resp. Br. at 7. After Johnson complained again of testicular pain on September 23, 2015, Dr. Obaisi requested a urology evaluation at UIC, but it was not approved in the October 2015 collegial-review discussion. Obaisi Dep. Tr. at 143:2-18, 144:8-19. The report from that discussion explained that "[t]he varicocele is … small and conservative treatment for the scrotal support with compliance is recommended at this stage." *Id.* at 144:24-145:15. There is nothing in the record to suggest that the decision of the collegial-review discussion was the product of anything other than reasoned medical judgment based on the relatively

small size of the varicocele. *See Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) (explaining that the choice to refer a prisoner to a specialist involves the exercise of medical discretion, and refusal to do so constitutes deliberate indifference only if it is blatantly inappropriate). "[T]he Eighth Amendment does not reach disputes concerning the exercise of a professional's medical judgment, such as disagreement over whether one course of treatment is preferable to another." *Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017).

In fact, when Johnson complained of worsening pain on February 2, 2016, Obaisi Dep. Tr. at 147:7-15, Dr. Obaisi responded "in a manner calculated to treat him[,]" *Duckworth v. Ahmad*, 532 F.3d 675, 682 (7th Cir. 2008). This time, Obaisi prescribed Rocephin, an injectable antibiotic, to treat the epididymitis and swelling, in addition to scrotal support and follow-up in 4 weeks. Obaisi Dep. Tr. at 147:19-22; *see also* Johnson Dep. Tr. at 120:3-10. Although Johnson asserts that he did not see Obaisi again for three months, Johnson's Affidavit at ¶ 38, Johnson offers no evidence to suggest that *Obaisi* himself caused the delay. In deliberate-indifference cases like this one, the plaintiff ought to use the tools of discovery to ferret out the reasons for delays in treatment, but Johnson points to nothing in the record that lays the blame at Obaisi's feet.

It is true that the varicocele did grow. According to Johnson, on May 3, 2016, Dr. Obaisi said that the varicocele had progressed to a moderate size and Obaisi prescribed Tegretol 200mg twice daily. Johnson's Affidavit at ¶ 38. Obaisi then placed another request for a urology evaluation, which was approved on June 7, 2016. Obaisi

Dep. Tr. at 148:7-20. Although Johnson naturally and understandably would have preferred the urology consultation to happen sooner, Dr. Obaisi's renewal of the request when the varicocele grew is consistent with the medical reasoning underlying the initial disapproval. *See Duckworth*, 532 F.3d at 680-82 (holding that a doctor's failure to order a cystoscopy, which delayed diagnosis of the inmate's bladder cancer, did not amount to deliberate indifference because the misdiagnosis and treatment efforts still were based on reasonable medical judgment). To be sure, there was a six-month delay between the approval of the urology consultation and Johnson's appointment at UIC on November 30, 2016. But here, again, Johnson does not offer evidence from which the jury can infer that *Obaisi* was responsible.

Moving on from the urology-specialist referral, Johnson also argues that Dr. Obaisi's refusal to recommend surgery caused needless suffering. *See* Pl.'s Resp. Br. at 4, 6-7. But Johnson was twice examined by Dr. Simone Crivellaro, a board-certified urologist (on November 30, 2016 and again on August 2, 2017), and at no point did Dr. Crivellaro recommend surgery. DSOF ¶¶ 51, 52; Crivellaro Dep. Tr. at 21:5-7, 29:5-7. Acting under Crivellaro's instructions resulting from the November 30 exam, Dr. Obaisi provided Johnson with Ibuprofen to manage the testicular pain. Obaisi Dep. Tr. at 53:6-23. When Johnson returned to UIC in August 2017, Crivellaro wrote in the clinic notes that Johnson was "[n]ot amenable to surgical intervention as an effort to reduce pain[.]" Crivellaro Dep. Tr. at 33:3-12. When asked to explain his reasoning, Crivellaro testified that "pain by itself is not an indication for surgical treatment of varicocele because there is no guarantee the pain is going away if we

perform a varicocelectomy … ." *Id.* at 33:3-12. He prescribed Tramadol, a controlled substance narcotic, and scrotal support to address Johnson's pain. *Id.* at 46:3-10, 56:2-9.[11]

On that record, a jury could only find that Dr. Crivellaro considered Johnson's reports of pain, and yet still did not believe that surgery was indicated. So Dr. Obaisi's decision to follow a specialist's recommendation for a non-operative course of treatment was reasonable and did not amount to recklessly disregarding Johnson's condition. The case law goes so far as to suggest that, generally speaking, "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (cleaned up).[12] Of course the circumstances are crucial in applying a broad principle like that, but in this case there is nothing in the record to suggest that Crivellaro was not minimally competent or that his non-surgical treatment plan was so off base that Obaisi should have, on his own, contradicted the specialist's recommendation. Yes, Johnson's retained expert, Dr. David Mayer,[13] opines that surgery *was* indicated, Mayer Dep. Tr. at 27:5-13, but

---

[11]Johnson appears to have received these treatments. His affidavit references taking Tramadol for testicular pain, Johnson's Affidavit at ¶¶ 54, 60; he also testified that he continues to wear a scrotal support device, Johnson Dep. Tr. at 114:15-23.

[12]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

[13]The defense argues that Dr. Mayer's opinions do not satisfy Rule of Evidence 702 because he is not a specialist in urology. But courts "often find that a physician in general practice is competent to testify about problems that a medical specialist typically treats." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010). Here, Mayer's qualifications provide a sufficient foundation for him to opine on the treatment of varicocele. *See id.* Mayer has personally supervised the quality assurance for 250 surgeons in all specialties, including urology, as well as evaluated adverse events like failure to diagnose and surgical

Mayer's opinion offers nothing specific in establishing that Obaisi's medical decisions fell so far below the standard of care as to qualify as reckless disregard of a known risk. *See Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) ("[E]vidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim.") (emphasis in original); *Shields v. Ill. Dept. of Corr.*, 746 F.3d 782, 796-97 (7th Cir. 2014) (holding that prison doctors who followed an outside specialist's recommendation for physical therapy—as opposed to surgery recommended by other physicians—were not deliberately indifferent, even though the patient ultimately needed surgery to fix his shoulder injury). All in all, even viewing the evidence in Johnson's favor, the factual record does not permit a reasonable jury to find that Dr. Obaisi was deliberately indifferent to Johnson's varicocele condition.

## 2. Lipoma

### a. Serious Medical Need

Turning to Johnson's second medical condition, the Defendants contest that the lipoma constituted an objectively serious medical need. R. 141, Defs.' MSJ Br. at 6-7. To prevail on this claim of deliberate indifference, Johnson must present enough evidence to allow a jury to find that the lipoma is a serious medical condition, meaning that it "has been diagnosed by a physician as mandating treatment or one that is so

---

complications. Mayer Dep. Tr. at 81:23-82:7. He also has "personal, extensive experience in operating, evaluating, and treating varicoceles for 35 years." *Id.* at 27:9-13. So the Court considered Mayer's opinions. As explained in the text, however, those opinions are not enough to allow a jury to find that Obaisi's deference to the specialist's treatment plan amounted to deliberate indifference.

obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Some facts that point to a serious medical condition include: "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (cleaned up).

In this case, Johnson provided evidence that an outside specialist recommended a surgery consultation for potential excision of the lipoma, Johnson Dep. Tr. at 102:20-105:8, which creates a genuine issue of material fact on whether the lipoma is a serious medical condition. *See Ortiz v. Bezy*, 281 Fed. App'x. 594, 598 (7th Cir. 2008) (holding that the plaintiff showed a genuine issue of material fact on whether his pterygia constituted a serious medical condition because various doctors who examined him recommended surgery and all prescribed some treatment). The factual record would also permit a reasonable jury to conclude that the seriousness of the lipoma would have been obvious even to a lay person, considering that (1) the lipoma visibly grew from 1.5cm by 1.5cm to 3.5cm by 3cm in less than a year, PSOF ¶¶ 93, 95, and (2) Johnson was experiencing headaches and blurred vision, *see, e.g.*, DSOF ¶¶ 53, 60.

The Defendants' argument that Johnson's assertions of headaches are "unsupported" and "medically-disproven" cannot carry the day on this record. First, "there is no requirement that a prisoner provide 'objective' evidence of his pain and

suffering—self-reporting is often the only indicator a doctor has of a patient's condition." *Greeno*, 414 F.3d at 655. Second, the record does not indisputably show that Johnson's headaches have been "medically-disproven." Sure, the defense offered an expert opinion from their retained physician, Dr. Andrew Dennis, to the effect that the lipoma would not impact "in any way, shape, or form a headache … ." DSOF, Exh. J, Dennis Dep. Tr. at 57:9-18. But Johnson's retained expert, Dr. David Mayer, testified that "[t]he lipoma was on the left frontal area of the head, which there's an orbital nerve that runs there, which, undoubtedly, was causing his pain and headaches. It enlarged, as I mentioned, ten times the size over four years." Mayer Dep. Tr. at 32:13-22. This specific dispute is not a mere disagreement between medical professionals about two reasonable courses of treatment. *Cf. Estate of Cole v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996) ("Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference."). Rather, Johnson's proffered expert testimony creates a triable issue on whether the lipoma caused him headaches and thus, qualified as a sufficiently serious medical need.

### b. Obaisi's State of Mind

Moving on from the objective element of the deliberate-indifference claim, Johnson still must offer evidence creating a genuine issue of material fact that Dr. Obaisi was aware of and consciously disregarded the lipoma. *See Greeno*, 414 F.3d at 653. It is true that "neither a difference of opinion among medical professionals nor even admitted medical malpractice is enough to establish deliberate indifference."

*Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016). But a jury may infer a sufficiently culpable state of mind "[w]hen the plaintiff provides evidence from which a reasonable jury could conclude that the defendant didn't *honestly* believe his proffered medical explanation." *Id.* (emphasis in original).

In this case, there is a genuine issue of material fact as to whether Dr. Obaisi was deliberately indifferent in treating the lipoma. Johnson repeatedly complained to Obaisi about experiencing headaches, blurred vision, and—on at least one occasion—even eye pain. *See, e.g.*, Johnson Dep. Tr. at 97:14-17, 101:15-22. Moreover, between February 23, 2012 and January 27, 2015, Johnson's lipoma grew from around 1.5cm by 1.5cm, to over double that size. *Id.* at 99:1-22; Williams Dep. Tr. at 36:15-37:1. That sort of growth is visible, and Obaisi actually examined Johnson multiple times during that period, *see, e.g.*, Obaisi Dep. Tr. at 121:18-122:2, so when the evidence is viewed in Johnson's favor, the jury could find that Obaisi saw the doubling in size—(plus, Obaisi had access to these measurements in Johnson's medical records)—and ignored it.

Dr. Obaisi ultimately referred Johnson to a UIC ophthalmologist, who examined Johnson on August 24, 2015 and—upon finding no ocular reason for Johnson's symptoms—referred Johnson for a neurology evaluation and to general surgery for possible excision of the lipoma. DSOF ¶ 64; Defs.' Resp. PSOF ¶ 101; Johnson Dep. Tr. at 102:20-105:8. But one week later, Dr. Ritz and Dr. Obaisi participated in a collegial-review discussion and decided not to approve Johnson for the general surgery and neurology consultations recommended by the UIC specialist.

*See* Third Am. Compl., Exhs. 3, 4; DSOF ¶ 65. Obaisi testified that he agreed with this outcome, signing both of the collegial-review reports (one for the general surgery referral and another for neurology). Obaisi Dep. Tr. at 59:6-15, 128:1-131:19. *See also* Third Am. Compl., Exhs. 3, 4; Obaisi Dep. Tr. at 107:14-18 (Q. "And ultimately as the medical director then you sign-off on the alternative treatment plan if you agree with it, correct?" A. "Yes."). On this basis, a jury could reasonably conclude that Obaisi acted with deliberate indifference by disregarding the UIC specialist's recommendation. *See Zaya*, 836 F.3d at 806 ("A jury can infer conscious disregard of a risk from a defendant's decision to ignore instructions from a specialist."); *Petties*, 836 F.3d at 729 (explaining that a doctor refusing to take instructions from a specialist can indicate that he or she crossed the threshold between an acceptable difference of opinion and an action reflecting sub-minimal competence).

It is true that if Dr. Obaisi offered a "cogent, medical explanation" for his decision to not approve the referrals, and if there is no evidence that this explanation is an ad-hoc rationalization, a sham, or otherwise reckless, then the evidence would not permit a jury to find deliberate indifference. *See Zaya*, 836 F.3d at 806. Obaisi testified that he did not remove the lipoma because he did not feel that it was causing Johnson's pain, and because the Atenolol helped Johnson's migraine. Obaisi Dep. Tr. at 57:20-58:10, 59:20-21, 60:2-62:1. But Obaisi also testified that he believed that the general surgery and neurology referrals were not indicated because it was just "[d]umping the problem from specialty to specialty. You have to draw the line and say, well, your lipoma is not responsible for the pain and your headache." *Id.* at 59:6-

20. A reasonable jury could infer that this was not a decision grounded on medical judgment, but rather, Obaisi giving up on trying to resolve Johnson's condition. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (finding that a jury could reasonably conclude that the prison doctor was deliberately indifferent when she did not refer the plaintiff to a dentist despite her failure to explain the plaintiff's tooth pain); *see also Petties*, 836 F.3d at 729 ("If a prison doctor chooses an 'easier and less efficacious treatment' without exercising professional judgment, such a decision can also constitute deliberate indifference."). It would be one thing if Obaisi had some medically based reason to conclude that Johnson's reports of headaches were really malingering, that is, Johnson was not really suffering from headaches at all. It is quite another thing for Obaisi to insist, in effect, that he had to be "convinced" that the pain was from the lipoma to approve its removal. Obaisi Dep. Tr. at 57:20-58:6. One reason to refer a patient from specialist to specialist is to determine the source of the problem and treat it, so a jury could find that Obaisi's pejorative characterization of the UIC recommendation as "[d]umping the problem," *id.* at 59:6-20, amounted to reckless disregard in denying the referrals. *See Hayes*, 546 F.3d at 526 (holding that a reasonable jury could find deliberate indifference where the prison physician, a general practitioner, "essentially said that he will not refer a patient to a specialist unless he already knows what the problem is[,]" even though "the very reason why a specialist would be called in is that a generalist is unable to identify the cause of a particular ailment.").

With regard to Obaisi's contention that the Atenolol provided Johnson some relief from the headaches, especially when Johnson received a higher dosage of the Atenolol in January 2016, the problem is that Johnson still suffered from the headaches every day. *See, e.g.*, Johnson Dep. Tr. at 115:16-116:4. In fact, Johnson avers that, on March 1, 2016, he complained to a physician of continuing headaches, was diagnosed with a migraine, and was again prescribed Tylenol. Johnson's Affidavit at ¶ 37. He underwent another CT scan on October 25, 2016, which showed normal results, but an MRI was recommended for further evaluation of the migraines. *Id.* at ¶ 41; *see also* PSOF ¶ 121. Although there is no deposition testimony as to these facts, the Court must, at this juncture, draw all reasonable inferences in Johnson's favor. Considering that additional testing was ordered, a jury could reasonably conclude that the non-operative course of treatment did not meaningfully improve Johnson's symptoms. And because the evidence shows that Obaisi, as medical director, was responsible for all referrals to UIC, for communications with outside hospitals, and for referrals to collegial review for off-site testing (such as a CT scan), *see, e.g.*, Obaisi Dep. Tr. at 10:2-8; DSOF, Exh. F, Ritz Dep. Tr. at 11:3-12:8, it would be reasonable to infer that Obaisi was aware that Johnson was still experiencing serious symptoms arising from the lipoma. For all these reasons, Johnson has provided enough evidence to survive summary judgment on the lipoma-related claims against Obaisi.

## B. Wexford

Johnson's lawsuit also targets Wexford Health Sources, Inc., the private corporation that provides medical services at Stateville. Private corporations acting under color of law are liable under the standard laid out in *Monell v. Dept. of Social Servs.*, 436 U.S. 658 (1978). *Shields*, 746 F.3d at 790. To satisfy *Monell*, Johnson must provide evidence that would allow a reasonable jury to conclude that "his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy." *Id.* at 796. As discussed next, Johnson's proffer of evidence falls short on the lack of treatment for the varicocele and for the *general* lack of treatment for the lipoma. But he does offer enough evidence to get to a jury on the *Monell* claim *specifically* for refusing to provide surgical treatment for the lipoma.

Johnson's overall argument is two-fold when it comes to general delay in treatment: that "Wexford's practice of delaying treatment and denying referrals precludes inmate from receiving proper medical care[,]" and that "Wexford has a widespread practice, policy, or custom … of elevating cost concerns over quality of care and medical personnel acting pursuant, results in the delay of proper care." Pl.'s Resp. Br. at 11, 12. Generally speaking, however, Johnson has no evidence that Wexford has a general practice of delaying treatment, apart from the record of his *own* treatment. As discussed earlier, the delays Johnson experienced throughout the treatment of his varicocele are largely unexplained, and he does not fill the gap with circumstantial evidence from which a jury could infer that some general *Wexford* practice is the cause of the delay in treating the varicocele.

Similarly, on the lipoma, Johnson complains that he first reported a lump on his head in May 2011 but was not examined until February 23, 2012. Pl.'s Resp. Br. at 3. He also complains that Wexford did not approve a CT scan for his head until November 4, 2014. *Id.* Without more, however, these unexplained delays—limited to evidence about just Johnson himself—do not amount to a policy, custom, or practice under *Monell*. *See Shields*, 746 F.3d at 796 ("[I]solated incidents do not add up to a pattern of behavior that would support an inference of a custom or policy."). Johnson also does not provide enough evidence to allow a reasonable jury to conclude the existence of a Wexford cost-cutting practice applying to all medical care, or even just to varicocele treatment.

But Johnson does offer some evidence that, if credited by the jury, would be enough for a *Monell* finding on Wexford's alleged refusal to refer inmates for surgeries for lipomas. Specifically, Johnson testified that around 2½ weeks before his deposition (which took place on May 16, 2016), Obaisi told him that "a lot of people getting these things, these bumps on their head from whatever and he don't know how to go about doing that. But Stateville don't want him to send people out for that . . . He just told me I'm going to need surgery to have that removed basically, but they basically ain't going to pay for that." Johnson Dep. Tr. at 64:6-19. Johnson also testified that, around two years before the deposition, Obaisi told him that "it's going to cost too much to send us out. His exact words was it's going to cost 3 to 4 thousand to send an inmate out." *Id.* at 65:9-18. In addition to Obaisi's alleged admissions, Johnson also testified that, in 2012 or 2013, he had an appointment with Dr. Anton

Dubrick (who was a Wexford physician at the time) regarding the lipoma on Johnson's head, and Dubrick admitted "that they wasn't going to do anything because Stateville wasn't going to pay to send me out for the surgery." *Id.* at 51:15-52:9.

Naturally, Dr. Obaisi testified that he "would never ever tell [an] inmate my mission is to reduce the cost of medical care." Obaisi Dep. Tr. at 73:5-10. Similarly, Dr. Neil Fisher—Wexford's Rule 30(b)(6) witness and its Corporate Medical Director for Quality Management and Pharmacy—testified that the estimated cost of a procedure is not a factor in granting or denying referrals. DSOF, Exh. C, Fisher Dep. Tr. at 36:5-7. But at the summary judgment stage, the Court must draw all reasonable inferences in Johnson's favor and also must credit his testimony that Dr. Obaisi and Dr. Dubrick did, in fact, make those admissions. *Cf. Sanders v. Melvin*, 873 F.3d 957, 960 (7th Cir. 2017) ("Our opinion in *Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013), recounts the circuit's flirtation with a doctrine that allows judges to disregard self-serving statements, and it overrules any precedents that so much as hinted in that direction."). What's more, Obaisi's alleged admission is not limited to *Johnson* only, but speaks to a broader policy: Obaisi supposedly said that "a lot" of inmates were suffering from bumps on their heads and that "Stateville don't want him [Obaisi] to send *people* out for that." Johnson Dep. Tr. at 64:6-11 (emphasis added); *see Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006) ("[T]o survive summary judgment, a plaintiff need not present a full panoply of statistical evidence showing the entire gamut of a defendant's past bad acts to establish a widespread practice or custom. Instead, it is enough that a plaintiff present competent evidence tending to

show a general pattern of repeated behavior … ."). All in all, in light of the summary judgment standard, Johnson has raised a genuine issue of material fact on whether Wexford had a widespread practice of refusing to treat lipomas and that Obaisi acted under that practice by refusing to treat Johnson's lipoma with surgery.

Johnson also has demonstrated a genuine issue of material fact on whether Wexford's cost-cutting practice was the "moving force" behind his constitutional injury. *See Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004). "The critical question under *Monell* remains: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?" *Glisson v. Ind. Dept. of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017). In Johnson's case, the collegial-review discussion on September 1, 2015—which refused to approve the general surgery and neurology referrals recommended by the UIC specialist—was between Dr. Obaisi and Dr. Stephen Ritz, the Corporate Medical Director for Utilization Management. Pl.'s Supp. Exh. A at 2-3; DSOF, Exh. F at 9-12. The responsibilities of the Utilization Management department included, for example, medical guidelines (such as guidelines for off-site consultations, in-patient reviews, and emergent treatment), as well as reports provided to the Illinois Department of Corrections regarding the number of off-site consultations. Fisher Dep. Tr. at 26:3-18, 28:4-22. Dr. Ritz's job responsibilities also specifically included supervising state medical directors and reviewing the Illinois contract. Ritz Dep. Tr. at 6:1-7.

Based on these facts, a reasonable jury who already inferred (1) that Dr. Obaisi acted with deliberate indifference to Johnson's serious medical condition (the lipoma) and (2) the existence of an impermissible cost-cutting refusal to refer to surgery, could also conclude that Dr. Ritz had final policymaking authority for Wexford. If all this evidence is credited and viewed in Johnson's favor, that is enough to show that Wexford was the "moving force" behind the deliberate indifference. What's more, a jury could reasonably infer that Dr. Ritz could not possibly enforce a blanket refusal to treat lipomas surgically without exhibiting deliberate indifference to the harmful consequences to patients. *See Thomas v. Cook Cty. Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010) (explaining that municipal liability also requires a showing that policymakers were "deliberately indifferent as to the known or obvious consequences" of the harmful custom or practice) (cleaned up). The *Monell* claim on the refusal to treat the lipoma surgically survives.

### III. Conclusion

The summary judgment motion is granted on the varicocele-based claims against both Defendants. But the lipoma-based claims against Obaisi and Wexford survive. After reviewing this Opinion, the parties shall engage in settlement negotiations, starting no later than October 10, 2019 with a reasoned and detailed demand from Johnson to the defense. The status hearing of October 24, 2019 remains

in place to check on the progress of settlement negotiations and, if warranted, to set a trial schedule.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 25, 2019